**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**LESTER L. SPURLOCK,**

          **Plaintiff,**

**v.**                                                        **Case No.: 3:17-cv-02240**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

          **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 9, 10).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**, the Commissioner's

1

request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On March 16, 2012, Plaintiff Lester Lee Spurlock ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of July 2, 2009[1] due to "back injury can't sit or stand, walk for long periods; high blood pressure; problem with throat; carpal tunnel in hands; tendonitis shoulders; and heart problems." (Tr. at 284-92, 330). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 156-61, 166-68, 173-75). Claimant filed a request for an administrative hearing, which was held on April 3, 2014 before the Honorable Edward E. Evans, Administrative Law Judge. (Tr. at 34-83). By written decision dated April 30, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 130-51). Claimant filed a request for review with the Appeals Council and the case was remanded by order dated December 1, 2015. (Tr. at 152-55). On remand, the case was assigned to the Honorable Robert B. Bowling, Administrative Law Judge (the "ALJ"). Claimant submitted additional evidence and a hearing was held on July 26, 2016. (Tr. at 84-125). By written decision dated August 19, 2016, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 15-33). The ALJ's decision became the final decision of the Commissioner on February 2, 2017, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

---

[1] Claimant's SSI application and disability report forms provided an onset date of July 2, 2009, while his DIB application stated that he became unable to work on June 28, 2011. (Tr. at 284, 291, 326, 364). The ALJ considered whether Claimant was disabled beginning on July 2, 2009. (Tr. at 15).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 7, 8). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 9). In response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 10). Consequently, the matter is fully briefed and ready for resolution.

## II.    <u>Claimant's Background</u>

Claimant was 37 years old at the time of his alleged onset of disability and 44 years old at the time of the ALJ's decision. Claimant completed the ninth grade in high school and received his commercial driver's license and herbicide applicator license, which he renewed every two years. (Tr. at 47, 91). He previously worked as an herbicide sprayer, electrician helper, and garbage truck driver and collector. (Tr. at 76).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of

whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review

performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The

decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 17, Finding No. 1). At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset date, July 2, 2009. (Tr. at 18, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "disorders of the spine and peripheral neuropathy of [the] left leg." (Tr. at 18, Finding No. 3). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except stand and walk six hours in an eight hour workday; sit six hours in an eight hour workday; needs a sit or stand option on a 30 minute basis; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch, and crawl; should avoid concentrated exposure to extreme cold and hazards such as the use of moving machinery, and unprotected heights.

(Tr. at 21, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 25, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 26, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1971 and was defined as a younger individual on the alleged disability onset date; (2) he had a limited education and could communicate in English; and (3) transferability of job skills

was not material to the disability determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled," regardless of whether his job skills were transferable. (Tr. at 26, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 26-27, Finding No. 10), including work as a routing clerk or price marker at the light exertional level or an inspector at the sedentary exertional level. (Tr. at 26-27). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus, he was not entitled to benefits. (Tr. at 27, Finding No. 11).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant argues that the Commissioner's decision is unsupported by substantial evidence because the ALJ failed to follow the directive of the Appeals Council to clarify on remand the severity and functional impacts of his back impairment and depression. (ECF No. 9). Claimant states that the ALJ's findings that his back impairment was mild and required only conservative treatment and his depression was not a medically determinable condition failed to properly evaluate the new medical evidence that he submitted and were contrary to the totality of the record. Further, Claimant argues that the ALJ erred in not obtaining additional medical information from experts, such as consultative examinations or medical interrogatories, which Claimant contends were "envisioned" by the Appeals Council's remand order.

In response, the Commissioner argues that the ALJ properly evaluated Claimant's back impairment and depression and weighed the opinion evidence. (ECF No. 10). Further, the Commissioner asserts that Claimant's argument that the Appeals Council's order "envisioned" that the ALJ would obtain an additional consultative examination or

medical interrogatories is belied by the fact that the Appeals Council did not expressly order such additional evidence and Claimant raised this issue in his second appeal to the Appeals Council and the Appeals Council denied his request for review. (*Id.*).

## V.   Relevant Evidence

The undersigned has considered all of the evidence of record, including documentation of medical examinations, treatment, evaluations, and statements. The information most relevant to Claimant's challenge is summarized as follows.

### A. Treatment Records

On April 24, 2007, Claimant presented to the Now Care Center at Huntington Internal Medicine Group ("HIMG") complaining of low back pain. (Tr. at 742). He related that he did not have a primary care provider and initially hurt his back by lifting something heavy while working in June 2006. (*Id.*). He stated that he did not have any issues until he recently went to St. Mary's Medical Center ("SMMC") and was determined to have a collapsed vertebrae. (*Id.*). He was given medications and a referral to an orthopedist. Claimant reported that he took the medications prescribed by SMMC and felt better; therefore, he did not immediately follow up with Scott Orthopedics. By the time he decided to go, the referral was no longer valid. (*Id.*). Claimant was prescribed Motrin and Flexeril at HIMG and again referred to Scott Orthopedics. (Tr. at 743).

On November 19, 2008, Claimant presented as a new patient to Myron A. Lewis, M.D., at HIMG. (Tr. at 478). Claimant stated that he worked at Asplundh,[2] which required a lot of heavy lifting. (*Id.*). Claimant reported that he injured his thoracic spine two or three years earlier lifting a heavy object and more recently injured his low back. He now

---

[2] Asplundh is a utility contractor that "performs tree pruning and removals, right-of-way clearing and maintenance, vegetation management with herbicides and emergency storm work and logistical support." *See* http://www.asplundh.com/about/

8

had low back pain radiating into his left thigh. (*Id.*). Dr. Lewis diagnosed Claimant with lumbar radiculitis, scheduled him for a MRI, and prescribed a Medrol Dosepak and Lortab. (Tr. at 479). Claimant's MRI was taken on November 25, 2008. (Tr. at 480-81). It showed some degenerative changes in Claimant's lower dorsal and lumbar spine, which were most pronounced at L4-5 where he also had a small disc protrusion. (Tr. at 481). However, Claimant did not have any significant spinal canal stenosis or clear cut nerve root impingement. (*Id.*).

On March 16, 2009, Claimant saw neurosurgeon Panos Ignatiadis, M.D., at Tri-State Neuroscience Center, Inc., for an evaluation at the referral of Dr. Lewis. Dr. Ignatiadis noted that Claimant suffered a back injury in July 2008 when his truck derailed from the track while working as a railroad contractor. (Tr. at 434). Although Claimant continued to work, he complained of persistent back and left leg pain for which he took pain medication. (*Id.*). Dr. Ignatiadis further noted that Claimant had a previous unspecified injury in 2007, but it had left no residual effects. (*Id.*). Dr. Ignatiadis reviewed the MRI, acknowledging a disc herniation at L4/5 on the left side and finding it consistent with Claimant's complaints. (*Id.*). Dr. Ignatiadis recommended conservative treatment and stated that Claimant could be reassessed "if he developed leg pain." (Tr. at 435).

On May 20, 2009, Claimant followed up with Dr. Lewis regarding lumbar radiculitis. (Tr. at 477). Dr. Lewis reviewed Claimant's examination by Dr. Ignatiadis, who did not feel that surgical intervention was warranted. (*Id.*). Dr. Lewis documented that Claimant's work involved heavy labor, so he needed something for pain control. (*Id.*). Claimant had been taking Lortab on an as-needed basis, and it worked fairly well. (*Id.*). Thus, Dr. Lewis continued Claimant's Lortab and planned to see him in six months. (*Id.*). When Claimant followed up with Dr. Lewis on February 3, 2010, his prescription of

Lortab was renewed to be taken on an as-needed basis for pain. (Tr. at 476).

On June 2, 2010, Claimant saw Dr. Lewis for a left posterior headache extending into his left shoulder area. (Tr. at 474). Dr. Lewis believed the headache was caused by muscle tension and prescribed Flexeril. (*Id.*). Claimant also saw Dr. Lewis on January 12, 2011. Dr. Lewis again noted that Claimant's job required a lot of heavy lifting, bending, stooping, and other postural activities. (Tr. at 473). Thus, Dr. Lewis felt that prescribing Claimant Lortab, as needed in order to perform his work duties, was appropriate, so he refilled the prescription. (*Id.*).

On May 18, 2011, Claimant presented to Dr. Lewis's office, stating that he was working as a truck driver, operating an 18-wheeler. (Tr. at 471). Claimant complained of "severe chronic back pains," which caused him to abuse his medication. He reported taking 10 to 12 Lortab pills per day and admitted that he was already out of medication. (Tr. at 471-72). Dr. Lewis prescribed Lortasan Potassium and Percocet. (Tr. at 472).

On January 2, 2012, Claimant presented as a new patient for pain management at the HOPE Clinic, PLLC, ("HOPE Clinic"), reporting chronic low back pain and stating that he previously suffered a railroad injury and motorcycle accident. (Tr. at 725). His pain was worse on the left side, and his straight leg raising test was positive. (Tr. at 726). He was prescribed Oxycontin. (Tr. at 725).

On January 30, 2012, Claimant again presented to HOPE Clinic and reported "no change." (Tr. at 722). He failed his urine drug test due to the presence of Lortab and stated that he took an old prescription that he had from April 2011. (Tr. at 710, 715). Claimant was advised that he could not take pain medications that were not prescribed by the clinic as it was against policy and the pain management contract that Claimant signed. (*Id.*).

10

On February 21, 2012, Claimant was admitted to Cabell Huntington Hospital ("CHH") for complaints related to his throat. (Tr. at 498). Claimant had a normal gait; no sensory issues or kyphosis, scoliosis, compression fractures, or tenderness to palpation in his back/spine; normal range of motion without obvious weakness; and he was alert, cooperative, and oriented with appropriate mood and affect. (Tr. at 500-02).

On February 27, 2012, Claimant presented to HOPE Clinic and still reported no changes. (Tr. at 713). Claimant again failed his urine drug test due to the presence of Lortab. (Tr. at 715, 717). He advised that he was prescribed Lortab at CHH for throat pain. (Tr. at 715). Claimant was told that his actions constituted "doctor shopping" and he must receive prior approval from the clinic before filling any prescription for pain medication as he was under a pain management contract. (*Id.*).

On March 28, 2012, Claimant followed up at Hope Clinic, stating that he had no change in his pain status. (Tr. at 709). He was continued on MS-Contin, Phenergan, Mobic, and Oxycontin. (*Id.*). The following month, on April 25, 2012, Claimant presented to Hope Clinic, still reporting no changes in his pain complaints, but stating that he no longer needed Phenergan. (Tr. at 707). He again failed his urine drug test by testing positive for Lortab, which was not prescribed to him by the clinic, and negative for morphine, which was prescribed to him and was not in his system. (Tr. at 701). Claimant stated that he did not take the morphine often, but did not have the leftover prescription to prove it. (*Id.*). He had no documentation showing the administration of Lortab at the hospital, as he stated. (*Id.*). Claimant was continued on Oxycontin, Mobic, and morphine. (Tr. at 707).

On May 9, 2012, Claimant saw Marion Huff, M.D., at University Physicians and Surgeons, to establish primary care after he was "fired" by Dr. Lewis approximately six

months earlier. (Tr. at 619). Since that time, Claimant had not seen any medical providers other than those at the pain clinic. (*Id.*). Claimant reported having a benign polyp removed from his uvula in the past, but he continued to have dysphagia, which was worsening and causing various associated symptoms, such as a weight loss of 50 pounds in three months. (*Id.*). Claimant was alert and oriented, and his sensation, strength, reflexes, and gait were all normal. (Tr. at 620-21). For his chronic pain, Claimant was advised that he would have to continue going to the pain clinic, as Dr. Huff would not prescribe any narcotics to him at any time. (Tr. at 621).

Claimant was admitted to the Behavioral Health Unit at SMMC from January 18 through 25, 2013. He reported that he came to the hospital due to his wife's ultimatum that he seek help, or she would leave him because he was "talking about suicide and spending all of his money on drugs." (Tr. at 827). Claimant snorted a Lortab before he arrived at the hospital and was, on a daily basis, taking 10 to 30 Lortab or Oxycotin pills "off the street," drinking five cups of caffeinated beverages, and smoking two packs of cigarettes, as well as using cannabis and occasionally taking a "nerve pill" to sleep. (Tr. at 836, 847, 856). He stated that he had some suicidal ideations over the past six months that were worse in the two days prior to his admission. He associated his thoughts of suicide with his narcotics abuse. (Tr. at 847, 856). Claimant was diagnosed with depressive disorder, not otherwise specified, and opioid dependence. (Tr. at 829). By the time of discharge, Claimant was calm, his mood was stable; his speech was within normal limits; his thought processes were logical; he denied suicidal and homicidal ideations; and his sleep was within normal limits. However, his insight was judged to be "limited." (*Id.*).

On July 24, 2013, Claimant saw physician's assistant Thomas J. Belford, Jr., at the office of Gregory D. Chaney, M.D. Claimant was ambulating normally, but his posture was

12

guarded, and he demonstrated global weakness in all range of motion aspects in his left leg. (Tr. at 807). For his lumbago, Claimant was prescribed Neurontin and an x-ray was ordered. (*Id.*). Claimant also reported depression and trouble sleeping, but he displayed good judgment; was active, alert, and fully oriented; and had normal mood, affect, and recent and remote memory. (Tr. at 807-08). Claimant was prescribed a 30-day dose of the antidepressant, Cymbalta, and Prazonsin. (Tr. at 807). Claimant's thoracolumbar x-ray was taken on August 12, 2013. When compared to a previous study taken on October 6, 2007, there were no acute findings. (Tr. at 818).

On August 14, 2013, Claimant again saw Mr. Belford. Claimant was ambulating normally, with normal gait and station. (Tr. at 804). His musculoskeletal, psychiatric, and neurological examinations were also all normal. (*Id.*). Mr. Belford documented that Claimant was going to physical therapy and refilled a prescription of Norco. (*Id.*). Claimant was not taking the Prazonsin that he was prescribed for insomnia, but remarked that Cymbalta was helpful for his "nerves." (*Id.*).

Claimant returned to Mr. Belford on September 13, 2013. He was still ambulating normally and his musculoskeletal, psychiatric, and neurological examinations were again normal. (Tr. at 800). For his lumbago, physical therapy was ordered and he was continued on Norco. (*Id.*). Claimant was additionally prescribed Lyrica for his unspecified myalgia, but there was no indication that he was continued on any medication for depression. (Tr. at 798, 800). It was noted that Claimant had "no signs of impairment." (Tr. at 800).

Claimant presented to Mr. Belford for monthly follow-up on October 14, 2013. He was still walking, normally and his musculoskeletal, psychiatric, and neurological examinations were all still normal. (Tr. at 796). Claimant stated that he had moderate back pain, radiating into his legs, which was not being controlled by medications at night.

(Tr. at 795-96). Mr. Belford increased Claimant's dosages of Norco and Lyrica. (Tr. at 796). He additionally prescribed Claimant Trazodone and Seroquel for insomnia, but discontinued his anti-depressant, as Claimant denied symptoms of depression. (Tr. at 796-97).

Claimant returned to Mr. Belford on January 29, 2014 for complaints of depression. Nonetheless, Claimant stated that he was able to maintain relationships; had a good mood without anxiety; did not have any major life stressors; did not have crying spells, panic attacks, or isolation; was sleeping well with a good appetite and energy; was not apathetic; and maintained functionality without any interference in his activities of daily living. (Tr. at 791-92). Claimant's physical examination had not change since the prior visit. (Tr. at 792). Mr. Belford observed no signs of impairment or withdrawal and felt Claimant medications were helpful, He continued Claimant on Norco, Seroquel, and Trazodone. (Tr. at 793). Claimant followed up at Dr. Chaney's office the following month, on February 28, 2014. He still had back pain, but it was not radiating. (Tr. at 787). His prescriptions of Lyrica, Norco, and Trazodone were continued. (Tr. at 788-89).

The following year, on July 28, 2015, an x-ray was taken of Claimant's lumbar spine due to his ongoing complaints of back pain. The x-ray showed degenerative changes, including mild disc space narrowing at L4-5 and T12-L1, with mild anterior osteophytosis and mild posterior osteophytosis at L3-4. (Tr. at 971). However, there was no spine instability with flexion or extension and no acute abnormalities. (*Id.*). A MRI of Claimant's lumbar spine was taken one month later on August 28, 2015 ad confirmed the absence of acute fractures and subluxation. (Tr. at 907). The imaging showed disc narrowing, mild facet degeneration, and a mild broad-based disc bulge at L3-4 with borderline central canal stenosis and moderate left neural foraminal stenosis, but no focal

14

disc herniation. (*Id.*). At L4-5, there was also disc space narrowing, mild facet degeneration, and a broad-based central disc herniation producing moderate central canal spinal stenosis. (*Id.*). At that level, Claimant had mild to moderate neural foraminal stenosis that was slightly greater on the right and right lateral recess stenosis. (Tr. at 907-08). Finally, at L5-S1, Claimant had a mild generalized disc bulge and mild facet degeneration, but no significant spinal canal stenosis. (Tr. at 908). Claimant had moderate to severe left neural foraminal stenosis at L5-S1. (*Id.*).

On February 3, 2016, Claimant began seeing William Williams, D.O., as his primary care physician, because his previous provider, Dr. Chaney, had "shut down" his practice. (Tr. at 936). Claimant stated that he had been out of some of his medications since November. (*Id.*). He was taking Lyrica and Norco for pain. (*Id.*). Claimant reported that he had constant back pain, which radiated into his left leg, and depression. Nonetheless, his behavior, mood, and affect were normal; depression was not included in the assessment of Claimant's conditions; and he was not prescribed any medication for depression. (Tr. at 936, 938-40). Claimant was also not prescribed any narcotic pain medications, as Dr. Williams wanted to first obtain the records from Dr. Chaney and CHH. (Tr. at 940).

On March 3, 2016, Claimant returned to Dr. Williams and continued to complain of constant low back pain. (Tr. at 929). Dr. Williams diagnosed Claimant with low back pain with left-sided sciatica, degenerative disc disease, and foraminal and spinal stenosis in the lumbar region. (Tr. at 933). He prescribed Norco and Lyrica for Claimant and told him to take Motrin between doses of Norco and use a heating pad for pain. (*Id.*).

On April 4, 2016, Claimant followed up with Dr. Williams, stating that his pain was worse, which was possibly attributed to the fact that he was not taking Lyrica since

November because his insurance provider determined that it was not medically necessary and would no longer pay for it. (Tr. at 922). Claimant reported throbbing pain in his lumbar spine with sharp pains down his leg. The pain was worse when Claimant was sitting, and his left leg would go numb and "give out" occasionally. (*Id.*). However, Claimant had not taken any pain medication since the prior Saturday. (*Id.*). Claimant was prescribed Neurontin and Norco and referred to a pain clinic. (Tr. at 926). Claimant again reported depression, but he stated that he was not nervous or anxious. Depression was not included in the assessment of Claimant's conditions or diagnoses, and he was not prescribed any medication for depression. (Tr. at 924-28).

On July 5, 2016, Claimant presented to Dr. Williams for follow up of back pain. (Tr. at 914). Claimant stated that he was still having back pain that radiated down his left hip and leg and sometimes caused burning and numbness down to his foot. (*Id.*). He continued to feel depressed, but was not on medication and his mood, affect, and behavior were normal. (Tr. at 916). On examination, flexion and extension of Claimant's left knee and ankle was mildly reduced at 4/5, but he had no musculoskeletal tenderness and normal muscle tone. (Tr. at 917). Dr. Williams noted that Claimant last saw a neurosurgeon in October and was told to return when symptoms worsened to the point of needing surgery. (*Id.*). Claimant requested a referral to a neurosurgeon. (*Id.*).

### B. Evaluations and Opinions

On July 17, 2012, Kip Beard, M.D., performed a consultative examination of Claimant for the West Virginia Disability Determination Service. Claimant reported back pain since his railroad truck derailed in April 2009. (Tr. at 762). Dr. Beard noted that Claimant did not seek treatment for about a year. He eventually had a MRI and was treated with medications, but did not have any physical therapy or surgery. (*Id.*). Claimant

reported that Dr. Lewis dismissed him as a patient, because Claimant did not have insurance coverage and could not afford to pay him. (*Id.*). Claimant reported that his back and associated left leg pain was constant and exacerbated by exertion or driving for a long period of time. (*Id.*). However, Claimant's gait appeared to be normal, and he did not use ambulatory aids. He could stand unassisted and step up and down from the examination table without difficulty. (Tr. at 763). Claimant appeared comfortable sitting, but he was mildly uncomfortable when lying on the examination table. (*Id.*). Claimant spoke understandably and followed instructions without difficulty. (*Id.*). Claimant expressed some mild discomfort on forward bending and had paravertebral tenderness without spasm with flexion to 80 degrees. (Tr. at 765). Claimant otherwise had normal range of motion in his spine, a negative straight leg raising test, and could stand on one leg without difficulty. (*Id.*). Dr. Beard diagnosed Claimant with chronic thoracolumbar strain with left radicular symptoms. (*Id.*).

On August 11, 2012, state agency physician, Rogelio Lim, M.D., evaluated Claimant's physical RFC based upon a review of records. Dr. Lim concluded that Claimant could perform light level work requiring only occasional postural activities, except that Claimant could never balance. (Tr. at 770-71). Dr. Lim also found that Claimant should avoid concentrated exposure to extreme cold, noise, fumes, and hazards. (Tr. at 773). Dr. Lim's RFC was affirmed by Rabah Boukhemis, M.D., at the reconsideration level of review on January 4, 2013. (Tr. at 785).

On April 1, 2014, Claimant's treating physician's assistant, Mr. Belford, completed a physical medical assessment of ability to do work-related activities form. Mr. Belford opined that Claimant could lift or carry 10 to 15 pounds for one to two hours per day, opining that Claimant had a restricted range of motion and increased weight caused

Claimant more pain and affected the way he walked. (Tr. at 819). Mr. Belford further opined that Claimant could only stand or walk for two to three hours in a work day and could do so for only 30 minutes without interruption. (Tr. at 820). Mr. Belford stated that Claimant had to sit after standing for 30 minutes, or after walking a city block, due to low back pain. (*Id.*). In addition, Mr. Belford opined that Claimant could only sit for one to two hours in a work day and could only sit for 15 to 20 minutes without interruption due to low back pain and restricted range of motion, which was exacerbated by sitting for greater than 15 minutes. (*Id.*). Moreover, Mr. Belford felt that Claimant could never perform any postural activities due to left leg weakness from his prior back injury and the fact that Claimant's leg has "gone out on him" at points of strain. (*Id.*). Finally, Mr. Bedford found that Claimant's limited movement and endurance placed him at a higher risk in terms of heights and moving machinery, and he could not drive long distances due to pain. (Tr. at 821).

### C. Claimant's Statements

At his initial hearing on April 3, 2014, Claimant testified that he became unable to work on July 2, 2009 when he injured his back in an accident at work. (Tr. at 44, 46). He did not receive worker's compensation benefits, but drew unemployment benefits from July 2009 through January or February 2011. (Tr. at 53). During that time, Claimant sought work everywhere that he could, including a bulldozer company and trucking companies. (Tr. at 54-55). Claimant got a job in early 2011 at a vegetation control company for the railroad, but he was having issues passing out while driving and was eventually laid off after five months. (Tr. at 48, 91).

Claimant described the pain in his back as "an ache" that would become a shooting pain with activity, such as putting his nephew in a stroller and pushing him to the end of

the street. (Tr. at 57). He took Norco three times per day for the pain, but stated that his pain still averaged a 7 out of 10 with medication. (Tr. at 58, 65). Claimant testified that his left leg "gave out" from under him a couple of times per week. (Tr. at 65). Claimant also reported depression that caused him to avoid social interaction. (Tr. at 68-69). He took Trazadone and Seroquel for sleep and mood stabilization. (Tr. at 67-68). After sitting or standing for 30 to 45 minutes, he had to shift positions and stretch, but stated that he could do a full-time job such as answering the phone if he did not have to remain seated the whole time and could move around as needed. (Tr. at 72-73).

Claimant testified that he and his wife divorced the prior year, and he now lived by himself in a garage behind the mobile home housing his ex-wife and children. (Tr. at 50). He drove every day, but it was usually short distances such as around the "small trailer park" or a couple of miles to the gas station. (Tr. at 52). He shopped for his own groceries and clothing and usually did his own laundry; he typically went grocery shopping twice per month without any issues. (Tr. at 52, 56). In a typical day, he watched television, drove around, visited neighbors, and went outside with his dog. (Tr. at 55). However, on bad days, which Claimant stated were 12 to 15 days out of the prior 30 days, he would stretch and take his medications, but otherwise mostly stayed in bed all day. (Tr. at 66).

At the remand hearing on July 26, 2016, Claimant testified that he had reconciled with his wife and lived in a double-wide mobile home with her, his 17-year-old step-daughter, and his three-year-old nephew, whom he adopted. (Tr. at 88-89, 118). Their source of income was death benefits from his step-daughter's father and "a check" for their son. (Tr. at 89). He still drove about every day to nearby places like the gas station or grocery store. (*Id.*). He noted that he completed the ninth grade and obtained his herbicide applicator's license, which required testing every two years. He also had a

19

commercial driver's license. (Tr. at 91). Claimant testified that he could not work because of bilateral carpal tunnel syndrome, tendonitis in his shoulder, and inability to sit, stand, or walk for long periods of time. (Tr. at 92). Claimant stated that his admission for "severe depression" in February 2013 was primarily to get his blood pressure and opioid addiction under control. He told the hospital that he was suicidal and abusing drugs, so that they would admit and treat him. He added that he did have depression at the time, but attributed his depression to ongoing proceedings and the recent death of his father. (Tr. at 94-96, 102-03).

In a typical day, Claimant woke up between 8:30 and 9:00 a.m., walked around and stretched, woke his son up, watched television, walked around and stretched more, and took an afternoon nap. He sometimes walked to the neighbor's house, watched his son play in the yard, or went to the grocery store. (Tr. at 96-97). He stated that his wife did most of the cooking, although he sometimes helped clear the table and load the dishwasher. He confirmed that his wife and daughter did most of the household chores. (Tr. at 97). Claimant took care of three dogs, but could no longer participate in any of his former hobbies, such as hunting and fishing. (Tr. at 99). He smoked two packs of cigarettes per day and had done so since he was 15 years old. (Tr. at 101). Claimant testified that he still had issues with depression at times, but not as frequently as before. (Tr. at 105). The depression mainly manifested when he was around crowds, so he avoided being around a lot of people. (*Id.*). However, Claimant denied having issues with memory, focus, or concentration. (Tr. at 106).

As to his back pain, Claimant stated that he first injured his back in 2006 and then pulled something in his back about a year later when switching a fuel pump in his truck. (Tr. at 109). His low back pain extended into his left hip and leg and caused a burning

20

sensation on the top of his foot. (Tr. at 110). His pain was constant and still averaged a 7 out of 10. (*Id.*). On a bad day, he mostly stayed in bed and on a good day, he sat in a hard wicker chair. (Tr. at 112). He had at least 10 to 12 bad days in the prior 30 days. (*Id.*). Claimant confirmed that he could lift his 25-pound son, if he did so carefully. (Tr. at 114). He could also lift a case of soda or gallon of milk and could change a tire. (Tr. at 115). However, Claimant stated that a year and a half ago, he fell off of a ladder when he was painting his house because his leg "gave out" on him. (Tr. at 117-18).

## VI.  **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

Claimant argues that the ALJ's decision is not supported by substantial evidence, because the ALJ failed to follow the Appeals Council's remand order regarding development of his back impairment and depression. (ECF No. 9 at 5). As the undersigned explained in a prior matter, there are differing opinions among federal courts as to whether 42 U.S.C. § 405(g) confers a district court with jurisdiction to consider whether an ALJ complied with an Appeals Council's remand order. *See Huddleston v. Astrue*, 826 F. Supp. 2d 942, 954 (S.D.W. Va. 2011); *also Erickson v. Colvin*, No. 5:14CV74, 2015 WL 3892293, at *3 (N.D.W. Va. June 24, 2015) (noting the split among federal courts as to whether the failure to follow an Appeals Council's remand order may serve as an independent ground for reversal absent other error). Several district courts in this circuit have held that an Appeals Council's remand order is merely an intermediate agency action and not the final decision of the Commissioner; such courts have emphasized that the court's review is limited to whether the ALJ's decision is supported by substantial evidence, or was reached through the application of an incorrect legal standard. *Smith v. Colvin*, No. 1:12CV1247, 2015 WL 3505201, at *3-4 (M.D.N.C. June 3, 2015) (collecting cases); *Tann v. Colvin*, No. 5:13-CV-663-D, 2015 WL 789276, at *7 (E.D.N.C. Feb. 24, 2015) *(*"While the remand order is relevant to the court's determination as to whether the ALJ adequately developed the record in this case, the court will not address the specific issue of whether the ALJ complied with the Appeals Council's remand order because it is not the task of this Court to review internal, agency-level proceedings such as whether the ALJ complied with specific provisions of the Appeals Council's remand order.") (internal markings and quotations omitted); *Henry v. Astrue*, No. CIV.A TMD-08-686, 2010 WL 3199344, at *2 (D. Md. Aug. 12, 2010) ("Therefore, as we have previously held, regardless

22

of whether the ALJ fully complied with the Appeals Council's remand order, judicial review is limited to the question of whether the ALJ's decision is supported by substantial evidence and reflects application of the correct legal standards."). Other courts have concluded that an ALJ's failure to comply with a remand order necessitates remand, while yet other courts have stated that the issue of whether an ALJ complied with a remand order is resolved when the Appeals Council adopts the ALJ's decision as the Commissioner's final decision; thereby, implicitly acknowledging that the ALJ's decision is compliant with the remand order. *Huddleston*, 826 F. Supp. 2d at 954. In this case the differences are irrelevant, because the ALJ complied with the Appeals Council's order and his decision is supported by substantial evidence.

### A. Back Impairment

Claimant contends that he submitted evidence on remand, including an updated MRI, x-rays, and treatment records, which substantiated his allegations of a severe and debilitating spine impairment. (ECF No. 9 at 5-6). Claimant argues that in spite of this evidence, the ALJ did not order any additional information, such as consultative examinations or medical interrogatories, and instead relied on "dated opinions" from a consulting examining source and non-examining sources. (*Id.* at 6). Claimant suggests that the Appeals Council's remand order "envisioned" the collection of such additional information by the ALJ. Claimant adds that the ALJ erred by concluding that Claimant's back impairment was mild and required only conservative treatment, stating that this finding "is without merit and disregards the totality of the evidence." (*Id.*).

At step two of the sequential evaluation, the ALJ found Claimant's back condition and peripheral neuropathy of his left leg to be severe impairments. (Tr. at 18). When he subsequently determined Claimant's RFC, the ALJ thoroughly considered Claimant's

allegations of back pain and associated symptoms, his treatment records, the findings on medical imaging, and the opinion evidence offered in the matter. (Tr. at 22-25). The ALJ specifically noted the results of Claimant's updated lumbar MRI taken in August 2015 and analyzed Claimant's more recent treatment records. (Tr. at 22). The ALJ concluded that, notwithstanding Claimant's subjective complaints of severe back pain with leg weakness and numbness, the records showed only minimal, conservative treatment. Furthermore, the objective medical findings reflected mild issues, without any significant limitation of range of motion, tenderness, or weakness. (Tr. at 25). The ALJ cited to specific evidence in the record; including, findings of normal gait and station, mild discomfort on forward bending, limited paravertebral tenderness, and no muscle spasms or weakness. (*Id.*). Furthermore, the ALJ pointed out the apparent inconsistency between Claimant's statements and the level of treatment Claimant received. (*Id.*). The ALJ reviewed the opinion evidence offered in the matter and gave great weight to the experts' opinions based upon Claimant's mild objective findings and conservative treatment. (*Id.*). The ALJ ultimately reduced Claimant's RFC to light work with only occasional postural activities, except no climbing of ladders, ropes, or scaffolds. (Tr. at 21). The ALJ further accommodated Claimant's complaints of leg weakness and numbness with a sit or stand option on a 30-minute basis. (Tr. at 21, 25).

The ALJ's above findings are supported by substantial evidence. While Claimant expressed complaints of back pain that radiated into his left leg and sometimes caused "burning and numbness" down to his foot, his most recent examinations as late as July 2016 continued to document only minimal findings, including mildly reduced flexion and extension in his left knee and ankle of 4/5, no musculoskeletal tenderness, and normal muscle tone. (Tr. at 917). Although Claimant stated that he was exploring the option of

back surgery, there are no records corroborating a physician recommendation of surgical intervention, or records showing that surgery was anticipated, scheduled, or received. Claimant requested a neurosurgery referral in July 2016, but did not provide any subsequent records demonstrating that such a consultation took place. (*Id.*). Rather, the evidence before the Court demonstrates that Claimant was indeed treated conservatively—generally with medication. (Tr. at 788-89, 926, 933).

Further, there is no merit to Claimant's argument that the Appeals Council's order "envisioned" consultative examinations and medical interrogatories on remand. As the Commissioner stresses, if the Appeals Council specifically wanted the ALJ to collect this type of additional information, that intent would have been expressly stated in the remand order. *See, e.g., Baran v. Berryhill*, No. 7:16-CV-134-BO, 2017 WL 3390438, at *3 (E.D.N.C. Aug. 7, 2017) (noting that the Appeals Council instructed the ALJ to obtain a consultative examination and medical source statements). In contrast, in this case, the Appeals Council did not instruct the ALJ to procure any specific additional evidence. (Tr. at 153-54). Indeed, the remand order primarily sought clarification based on the existing record. (Tr. at 153). Further, as noted by the Commissioner, Claimant already raised this precise challenge with the Appeals Council, yet his request for review was denied. (Tr. at 1, 425). In any event, an "ALJ's duty to assist in developing the record is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Lichlyter v. Astrue*, No. 6:11-CV-00597, 2012 WL 4378142, at *2 (S.D.W. Va. Sept. 25, 2012) (citations omitted); *accord Ferrell v. Astrue*, No. 3:11-CV-00503, 2012 WL 4378126, at *2–3 (S.D.W. Va. Sept. 25, 2012). "An ALJ may order a consultative examination when the evidence on the record is insufficient for the ALJ to determine whether the claimant is disabled." *Id.*; *see* 20 C.F.R. §§ 404.1519a, 416.919a;

*Powell v. Comm'r, Soc. Sec. Admin.*, No. CIV. SAG-11-790, 2013 WL 2300971, at *1 (D. Md. May 23, 2013) ("A consultative exam is only needed when the evidentiary record before the ALJ is inadequate."); *Welsh v. Comm'r, Soc. Sec.*, No. CIV. JKB-14-3891, 2015 WL 5198658, at *2 (D. Md. Sept. 4, 2015) ("Regulations provide that a consultative examination may be purchased where the ALJ lacks sufficient evidence to reach a conclusion about disability.").

"A reviewing court gives deference to an ALJ's decision about how much evidence is sufficient to develop the record fully and what measures are needed in order to accomplish that goal." *Lichlyter*, 2012 WL 4378142, at *2 (citation omitted); *Ferrell*, 2012 WL 4378126, at *2–3. Here, the ALJ determined that Claimant's treatment records, medical imaging, July 2012 consultative examination, non-examining opinions, and other evidence in the record were sufficient for making a disability determination. Claimant points to his August 2015 MRI and x-rays and more recent records—which he contends show that he was taking narcotic pain medication, needed a new MRI for consideration of back surgery, and was suffering from left leg weakness and parenthesis— as evidence that a new consultative examination or more opinion evidence was warranted. (ECF No. 9 at 6). However, the ALJ specifically analyzed this evidence and concluded that it did not fully support Claimant's subjective complaints. (Tr. at 22, 24, 25). The ALJ had no obligation to solicit an additional consultative examinations or medical opinions simply because the case was remanded, or Claimant offered an updated MRI and recent records. The undersigned does not find any inconsistencies or evidentiary gaps in the record sufficient to overcome the deference afforded to the ALJ's decision to proceed on the record before him.

In sum, the Court's role in reviewing the ALJ's decision is not to review and reweigh the evidence to reach an independent determination as to whether Claimant's impairments are disabling. Rather, the Court's duty is to determine whether the ALJ's decision is supported by more than a scintilla of evidence and is based upon a correct application of the law. Claimant does not show, nor does the undersigned find, that the ALJ violated any applicable social security rule or regulation. Thus, for the reasons stated, the undersigned **FINDS** that the ALJ's determination regarding the severity and persistence of Claimant's back and left leg impairments is supported by substantial evidence.

### B. Depression

Claimant raises the same challenge to the ALJ's decision that Claimant's depression was not disabling, stating that the ALJ erred in not ordering a consultative examination or medical interrogatories from experts. (ECF No. 9 at 7). Further, Claimant argues that the ALJ added "insult to injury" by concluding that Claimant's depression was not a medically determinable impairment despite a recent medical record in which his treating physician noted: "+ Depression." (*Id.*).

At step two of the sequential evaluation, the ALJ performed the special technique to evaluate the severity of Claimant's mental impairments. In terms of activities of daily living, the ALJ found that Claimant was only mildly impaired; noting that Claimant mowed the lawn, carried in groceries, took out the trash, shopped for necessities, cared for his dogs, performed most personal care activities, watched his three-year-old son, and visited neighbors. (Tr. at 20). The ALJ found that Claimant had no limitation in social functioning or maintaining concentration, persistence, or pace. (*Id.*). The ALJ remarked that although Claimant did not like to be around people and did not go to social functions

27

or go out to eat, he nonetheless went shopping and visited his neighbors. (*Id.*). Similarly, although Claimant reported having trouble completing tasks, he regularly watched television with no reported issues. (*Id.*). Moreover, the ALJ found that Claimant did not have any episodes of decompensation of extended duration. (*Id.*).

The ALJ cited that Claimant complained of depression to his treating physician in 2013 and was prescribed Cymbalta, which he stated was helpful. (Tr. at 19). He was diagnosed with a mood disorder and depressive disorder. (*Id.*). However, in July 2016, Claimant was not taking any medication for depression and had a normal mood and affect. Of significance to the step two finding, the ALJ emphasized both Claimant's testimony that he did ***not*** have a problem with depression and his statement that he only claimed to have severe depression in the past to receive psychiatric treatment for his addiction. (*Id.*). Accordingly, the ALJ found that Claimant's depression was not a medically determinable impairment. (*Id.*).

The ALJ's findings regarding Claimant's alleged depression are supported by substantial evidence. Claimant received in-patient treatment at a hospital's behavioral health unit from January 18 through 25, 2013 where he was diagnosed with depressive disorder, not otherwise specified, and opioid dependence. (Tr. at 827). However, Claimant subsequently admitted that he complained of severe depression in order to get his physicians to admit him to the hospital and treat his blood pressure and opioid addiction. He stated that he advised the hospital that he was suicidal and on drugs so that the hospital would treat him. (Tr. at 94-96, 102-03). Claimant acknowledged having situational depression at that time due to his divorce and the recent death of his father, but indicated that substance abuse was his overriding problem. (Tr. at 102-03). By the time of discharge, Claimant was calm; his mood was stable; his speech was within normal

limits; his thought processes were logical; and he denied suicidal ideation, although his insight was limited. (Tr. at 829). During an office visit with his primary care provider months later, in July 2013, Claimant complained of depression, but showed good judgment; he was active, alert, and fully oriented; and he had normal mood, affect, and memory. (Tr. at 807-08). At his monthly visits in August, September, and October 2013, Claimant's psychiatric examinations were normal, and he was not on any medication for depression. Indeed, in October 2013, Claimant denied having depression. (Tr. at 796-97, 800, 804). Although Claimant again reported depression in January 2014 to his primary care provider, he stated that he was able to maintain relationships; he had a good mood without anxiety; he did not have any major life stressors; he did not have crying spells, panic attacks, or isolation; he was sleeping well with a good appetite and energy; he was not apathetic; and he maintained functionality without any interference in his activity of daily living. (Tr. at 791-92). Therefore, Claimant essentially denied having any of the classic symptoms of depressive disorder. Moreover, Claimant showed no signs of impairment or withdrawal, and he confirmed that his medications were helpful. At that time, he was prescribed Seroquel and Trazodone for insomnia. (Tr. at 793). When Claimant began seeing Dr. Williams in February 2016, he again reported depression, but his behavior was still normal with normal mood and affect; depression was not listed as a diagnosis; and he was not prescribed any medication for the condition. (Tr. at 938-40). Again, in April 2016, Claimant reported depression to Dr. Williams, but he was not nervous or anxious and depression was not listed as a diagnosis, nor was he prescribed any medication for it. (Tr. at 924-28). In addition, as noted by the ALJ, Claimant performed a variety of activities of daily living and social interaction. He stated in July 2016 that he drove daily to places such as the gas station or grocery store, watched

television, visited with neighbors, watched his son play in the yard, and cared for his dogs. (Tr. at 89, 96-97). He testified that he still had depression "at times," but not as frequently as before, and he had no issues with memory, focus, or concentration. (Tr. at 105-06).

"A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908.[3] At times, Claimant told his primary care providers that he felt depressed. However, his mental status was repeatedly normal on examination. He did not receive specialized mental health treatment for depression, and he acknowledged that what he considered to be "depression" greatly improved by 2016. Furthermore, Claimant's more recent records did not document diagnoses or treatment for depressive disorder.

In any event, the ALJ found that Claimant suffered from numerous severe impairments. (Tr. at 25). Accordingly, the sequential process proceeded to step three. From that perspective, even if the ALJ erred by not considering Claimant's alleged depression to be medically determinable, Claimant suffered no harm because the outcome at step two was the same: his applications for benefits moved on to the next step in the sequence. Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W. Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290,

---

[3] These particular regulations have been amended and reserved since the decision in this case.

2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W. Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W. Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."); A number of federal courts of appeals have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Despite concluding that Claimant did not have the "medically determinable" impairment of depressive disorder, the ALJ proceeded to analyze the functional impact

of Claimant's periodic episodes of mental distress, finding that Claimant had mild or nonexistent functional limitations related to any mental impairment. (Tr. at 20). Claimant does not assert a specific error, nor does the undersigned find any error, in the ALJ's analysis. Accordingly, Claimant simply has not demonstrated that a consultative psychiatric examination or further evidence was warranted in this case. *See, e.g., Smoot v. Colvin*, No. 16-CV-03159-JMC, 2017 WL 4867713, at *3 (D. Md. Sept. 5, 2017) ("Taken as a whole, the record provides substantial evidence to support the ALJ's conclusion that Mr. Smoot does not suffer from any mental impairment and, therefore, that a consultative psychological examination was not necessary to further supplement the record.").

Accordingly, after reviewing the entire record, the undersigned **FINDS** substantial support for the ALJ's findings regarding Claimant's depression.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 9); **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 10); **AFFIRM** the decision of the Commissioner; **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to

file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: April 2, 2018

Cheryl A. Eifert
United States Magistrate Judge